No. 47,397

FARM BUREAU MUTUAL INSURANCE Co., *Appellant*, v. BOBBY D. CARR and PHYLLIS J. CARR and DUANE BORDWELL d/b/a DUANE'S MOTOR Co., *Appellees*, HAROLD MORTON and ST. PAUL FIRE AND MARINE INSURANCE Co., *Third Party Defendants*.

(528 P. 2d 184)

Opinion filed November 2, 1974.

*Gerald Sawatzky*, of Foulston, Siefkin, Powers and Eberhardt, of Wichita, argued the cause, and *Robert C. Foulston* and *Richard D. Ewy*, of the same firm, were on the brief for the appellant.

*Terry O'Keefe*, of Kidwell, O'Keefe and Williamson, Chartered, of Wichita, argued the cause and was on the brief for appellees and cross-appellants Carr.

*Philip R. Sturgis*, of Wichita, argued the cause, and *Jack N. Turner*, of Wichita, was on the brief for appellee Duane Bordwell, d/b/a Duane's Motor Co.

The opinion of the court was delivered by

FOTH, C.: The primary issue in this case is whether an insured who loses his automobile through fraud is entitled to recover its value from his insurance company under his policy's "comprehensive loss" coverage. A secondary issue involves the rights of the insured (or his subrogated insurance carrier) against a third party who innocently purchased the car from the perpetrator of the fraud. Farm Bureau Mutual Insurance Co. brought this declaratory judgment action against its policyholders, Mr. and Mrs. Bobby D. Carr, and against the third party purchaser, a used car dealer named Duane Bordwell. The Carrs counter-claimed for the reasonable value of their car. (Other pleadings are irrelevant in view of the outcome.) Trial was to the court, and it held that the loss was covered by the policy, and further, that the company had no right to recover over against Bordwell. Farm Bureau has appealed, contending that either one or the other of these rulings must be erroneous. The Carrs have cross-appealed from a ruling denying them attorney fees.

In June, 1971, the Carrs owned a 1968 Oldsmobile Cutlass which was insured by Farm Bureau. The car was used by their son, but was titled in the names of "Bobby D. and/or Phyllis J. Carr." They decided to sell it, and advertised it for sale in the newspaper. On the afternoon of June 3 the ad drew a response from a smooth

talker who identified himself to Mrs. Carr as Mr. Sutton. "Sutton" expressed interest in the car on behalf of a client. After some thirty minutes of negotiation "Sutton" agreed to buy the car for the Carrs' asking price of $2,000. He would return later to close the deal.

Mrs. Carr called her husband, who advised her to check with the bank if the purchaser offered a personal check. When "Sutton" returned, however, he offered the printed check of a local Buick dealer, drawn by typewriter and imprinted with a check protector. Mrs. Carr accepted it without hestitation, gave him the keys, the car, and the certificate of title.

The title was signed by her, but not notarized nor otherwise filled in. Mr. Carr's signature was not on the certificate at the time Mrs. Carr delivered it to "Sutton." There is no question, as the trial court found, but that Mrs. Carr intended to sell the car, and when she "received the check, signed and delivered the Certificate of Title to 'Sutton' and gave 'Sutton' the automobile, she considered the automobile as having been sold."

Later that day Mrs. Carr remembered the license tags on the car and called the Buick dealer who had ostensibly purchased it. It was then she learned that the check had been stolen and that "Sutton" was an impostor. She immediately called her husband, who in turn called the police and Farm Bureau.

In the meantime "Sutton," too, had been busy. He first took the certificate of title to a used car lot and a notary public who knew him by sight as a prospective purchaser. The notary affixed his signature and seal. He then went on to a second used car lot, Bordwell's, and offered the car for sale. Bordwell called the notary and asked if Sutton was all right. The notary confirmed his signature and assured Bordwell that so far as he knew everything was fine. Bordwell bought the car for $900, filling in his company's name as transferee on the certificate of title. It is not definitely known when or by whom the purported signature of Mr. Carr was placed on the certificate, but the trial court found it was there when Bordwell bought the car. The trial court also made an unchallenged finding that "Bordwell was an innocent bona fide purchaser in good faith and for value."

"Sutton" has never been seen again.

In its petition Farm Bureau alleged that it didn't know whether the loss of the automobile by the Carrs was by theft or whether the circumstances came under one of the exclusions of the policy. It asked simply for a determination of the coverage question. It

did claim that if the loss was by theft, and was covered, then Bordwell got no title to the car. In that case, it alleged, the company and the Carrs were entitled to recover the car or its value from Bordwell. The trial court, as noted, found against the company on both issues.

On appeal the company's position has hardened on the coverage question. It contends first of all that its comprehensive loss clause, "Coverage D," insures only against "any direct and accidental loss of . . . the automobile." Mrs. Carr's voluntary surrender of the car and the certificate of title, it says, are not the kind of direct and accidental loss intended to be covered.

Our previous cases have uniformly held that fraudulent schemes like that employed here constitute a "theft" under policy provisions insuring against "theft, robbery or pilferage." *Motor Co. v. Insurance Co.*, 111 Kan. 225, 207 Pac. 205; *Overland-Reno Co. v. Indemnity Co.*, 111 Kan. 668, 208 Pac. 548; *Overland-Reno Co. v. Indemnity Co.*, 115 Kan. 137, 222 Pac. 122. In the *Motor Co.* case the syllabus held:

"Under a contract of insurance issued to protect a dealer in automobiles against 'theft, robbery or pilferage,' the act of a swindler who deprived the insured of an automobile by means of a preconceived plan which involved impersonation, misrepresentation and fraud was a species of theft for which the insurance company was liable."

The second *Overland-Reno* case disposes of the company's reliance on Mrs. Carr's intent to deliver title in a completed sale as a distinguishing feature:

". . . The insurance company cannot evade liability because the party delivering the car to the thief could not, or did not, think of every possible element of precaution *in making, in good faith, what he supposed was a bona fide sale.*" (115 Kan. at 139. Emphasis added.)

Cf. also, *Tripp v. United States Fire Ins. Co.*, 141 Kan. 897, 44 P. 2d 236, reaffirming these principles as "settled" law.

In each of the first three cases cited the car was obtained through an impersonation, the giving of a worthless check, and a purported sale. In each the court held there was a "theft" despite the common law distinctions recognized in the then-existing criminal code between larceny and obtaining property by false pretenses. Our new criminal code, in effect when this loss occurred, has obliterated that distinction. It describes but one such crime, denominated "theft." It includes the former larceny and false pretenses crimes, and many other dishonest means of acquiring property as well. See

K. S. A. 1973 Supp. 21-3701, and the accompanying notes of the Judicial Council. We hold that the loss of the car to "Sutton" was a loss by theft.

Farm Bureau cites us to a line of cases from the District of Columbia which reach a contrary conclusion. *Great American Indemnity Company v. Yoder* (D. C., Mun. App., 1957), 131 A. 2d 401; *Boggs v. Motors Insurance Corporation* (D. C., Mun. App., 1958), 139 A. 2d 733; *General Accident Fire & Life Assur. Corp. v. Denhardt* (D. C. C. A., 1969), 253 A. 2d 450. Each of these cases is based on a distinction between the crimes of larceny and false pretenses. A "theft," it was held, must include a "trespass," even in common parlance. It does not include a voluntary delivery of possession and title, even though induced by false pretenses. In this state we cleared that hurdle in 1922, in *Motor Co. v. Insurance Co.*, supra. We believe the Carrs' immediate reaction would be the common one, *i. e.*, that their car had been "stolen."

The company suggests that its "direct and accidental loss" language should be interpreted differently from the "theft, robbery or pilferage" language in the policies considered in our earlier cases. The Farm Bureau language is, if anything, broader in its scope. Any contention that such language was not intended to include loss by theft cannot be taken seriously; as a "condition" (No. 11) the policy specifically requires the insured, in case of loss under Coverage D (this coverage), to give prompt notice to the company "and also, in the event of theft, larceny, robbery or pilferage," to the police. Theft obviously is a loss included under Coverage D.

As a second line of defense to liability under the policy, the company asserts that the Carr-"Sutton" transaction is within one of two exclusions to the coverage otherwise granted. The first is:

"(1) under Coverages D, E and F, if the described automobile is or at any time becomes subject to any bailment lease, conditional sale, purchase agreement, mortgage or other encumbrance not specifically declared and described in this policy. . . ."

The company singles out the term "purchase agreement" and asserts that it describes the contract between Mrs. Carr and "Sutton." We do not so read the term when it is taken in context. It is, it will be noted, one of four specifically named contractual arrangements followed by the catch-all "or other encumbrances." Each of the other three specific arrangements encompasses an executory contract where more than one party has an interest in the car at the same time, viz: lessor-lessee; conditional vendor-conditional vendee;

mortgagor-mortgagee. These, and likewise any "other encumbrance," all contemplate possession of the car in one party while the other has an interest evidenced by either title or some sort of lien or encumbrance. We cannot believe the term relied on by the company, inserted in the middle of the other four, was intended to mean anything so radically different from its fellows as the company would suggest.

Our reasoning in this respect is an application of the ancient and well-known maxim, *noscitur a sociis*, literally, "it is known from its associates."

". . . *Noscitur a sociis* is a rule of construction applicable to all written instruments. Where any particular word is obscure or of doubtful meaning, taken by itself, its obscurity or doubt may be removed by reference to associated words. And the meaning of a term may be enlarged or restrained by reference to the object of the whole clause in which it is used." (*Virginia v. Tennessee*, 148 U. S. 503, 519, 37 L. Ed. 537, 13 S. Ct. 728.)

See also, *Black's Law Dictionary* (Fourth Edition); and cases collected at 66 C. J. S. 607-8.

Under this doctrine, which is but a common sense aid to the construction of doubtful language, the phrase "purchase agreement" must be read to mean an executory contract of the type described in its accompanying phrases. The transaction between Mrs. Carr and "Sutton" wherein she delivered the car and title in return for contemporaneous payment cannot be that type of "purchase agreement" because the contract was ostensibly fully executed when the bargain was struck.

As we see it the purpose of exclusion (1) was to prevent the benefits of the insurance from redounding to the benefit of persons who acquired an interest in the car unknown to the company, and who might reasonably be expected to secure their own insurance. It will be noted that the exclusion applies not only to Coverage D (comprehensive) but E (collision or upset) and F (towing) as well.

The second exclusion relied on is:

"(*q*) under Coverage D, to loss due to wrongful conversion, embezzlement or secretion by any person in lawful possession of the automobile under a bailment lease, conditional sale, purchase agreement, mortgage or other encumbrance. . . ."

This exclusion, applicable to comprehensive coverage only, deals specifically with loss through the dishonesty of someone already in lawful possession of the car. Since the possession must be under one of the five identical arrangements listed in exclusion (*l*), the

foregoing discussion of that exclusion is also applicable to $(q)$, and leads to the same result.

In addition, $(q)$ requires an initial "lawful" possession by one who later converts, embezzles or secretes. We have already concluded that "Sutton" acquired possession by theft. This "larcenous" intent was present at the outset; while his manner of acquiring possession was peaceable we can in no way say it was ever lawful.

Hence we conclude that neither of the exclusions relied on by the company was applicable, and the trial court correctly rendered judgment for the Carrs against the insurance company for the reasonable value of the car.

We turn, then, to the contention that if "Sutton" was a thief he could convey no title to Bordwell. The result, it is claimed, is that the Carrs, and therefore the company, should be able to recover the car or its value from Bordwell. The trial court disposed of this argument by the following succint finding:

"10. That plaintiff, Farm Bureau, is not entitled to recover judgment against Duane Bordwell. Farm Bureau is in the position of Mrs. Carr were she attempting to recover judgment against Bordwell. The automobile was voluntarily surrendered by Mrs. Carr, who parted with possession of it with intent to pass title to 'Sutton,' thus giving 'Sutton' all the indicia of ownership and the apparent right of disposal. Under such circumstances, Bordwell, a bona fide purchaser from 'Sutton' will be protected. Farm Bureau cannot recover judgment against Bordwell because it now assumes the position of Mrs. Carr, who could not have recovered judgment against Bordwell for the reason that she was the person who put it in the power of 'Sutton' to commit the fraud and must be the sufferer."

The trial court's conclusion is amply supported by authority. When Mrs. Carr gave "Sutton" the certificate of title endorsed in blank she clothed him with indicia of title upon which a good faith purchaser for value and without notice might rely. *Brooks v. Union National Bank,* 137 Kan. 328, 20 P. 2d 830; *Nolan v. Robertson,* 131 Kan. 333, 291 Pac. 750; *Luzadder v. Hale,* 118 Kan. 85, 233 Pac. 1046; *McNeil v. Jordan,* 28 Kan. 7. This result is achieved by applying the oft-stated rule that "where one of two innocent persons must suffer by reason of the fraud of another, he who trusted the wrongdoer and placed the means in his hands to commit the wrong must bear the loss." *Bicknell v. Jones,* 203 Kan. 196, 453 P. 2d 127, Syl. ¶ 3. See also, *Mid Kansas Federal Savings & Loan Ass'n. v. Binter,* 197 Kan. 106, 415 P. 2d 278; *Whisnant v. Schmid Motor Co.,* 184 Kan. 348, 336 P. 2d 398.

In such cases, as in this case, the swindler acquires no "title" as a result of his fraudulent scheme. As to him, the original owner retains title and the fraudulent acts constitute theft. But where the owner's title comes up against the rights of a bona fide purchaser, equity will weigh the conduct of each to determine who will prevail. In the case of automobiles, shares of stock and other property which passes by the assignment of documentary evidence of title, the endorsement and delivery of the certificate to the thief weigh heavily against the owner. By and large, as we have noted, such conduct is considered of sufficient gravity as to estop the owner from asserting his title. It is simply a matter of who has the superior equity.

Cases from other jurisdictions which reach the same result include *White v. Pike,* 240 Iowa 596, 36 N. W. 2d 761; and *Hutson v. Walker,* 37 Wash. 2d 12, 221 P. 2d 506. In each the owner of an automobile was fraudulently induced to part with both possession and an endorsed certificate of title. In each, the court held the owner to be estopped from asserting his title against a subsequent bona fide purchaser for value. Cf. also, *Kelsoe v. Grouskay,* 70 Ariz. 152, 217 P. 2d 915.

Because we are dealing with estoppel to assert title, and not with title itself, it is of no moment that Mrs. Carr did not comply with K. S. A. 8-135, as amended, the statute regulating the assignment of certificates of title. Noncompliance with the statute may have made the transfer void; the fraud of "Sutton" certainly made the transfer void—his title would have been no better had there been strict compliance with the statute. But we are not dealing here with the quality of "Sutton's" title—we are only concerned with whether the Carrs may assert their concededly good title against Bordwell, the bona fide purchaser. It is clear they may not.

There is, then, no irreconcilable inconsistency between the trial court's findings that "Sutton" was a thief, and yet Bordwell acquired title from him that is good as against the true owners, the Carrs. The judgment on both issues must be affirmed.

Finally, we must determine whether the trial court erred in denying attorney fees under K. S. A. 1973 Supp. 40-256. It found that Farm Bureau's refusal to pay was not "without just cause or excuse." We have said many times that the issue is primarily one of fact to be determined in the first instance by the trial court (*Sloan v. Employers Casualty Ins. Co.,* 214 Kan. 443, 521 P. 2d 249;

*Ogden v. Continental Casualty Co.*, 208 Kan. 806, 494 P. 2d 1169; *Koch, Administratrix v. Prudential Ins. Co.*, 205 Kan. 561, 470 P. 2d 756) and must depend on the facts and circumstances of each case (*Forrester v. State Farm Mutual Automobile Ins. Co.*, 213 Kan. 442, 517 P. 2d 173; *Wheeler v. Employer's Mutual Casualty Co.*, 211 Kan. 100, 505 P. 2d 768; *Sturdy v. Allied Mutual Ins. Co.*, 203 Kan. 783, 457 P. 2d 34).

In this case there was never any significant dispute over the facts on which the liability or non-liability of the company would depend. Hence our cases dealing with an insurance company's duty to investigate are not applicable. In cases such as *Forrester and Sturdy* we have recognized that the presence of a good faith legal controversy, particularly if it involves a matter of first impression in this jurisdiction, may constitute just cause or excuse for a company's refusal to pay.

In this case we think the "theft" issue was well settled by our cases. The applicability of the exclusions, however, had not been tested; it presented what could reasonably have been regarded by the trial court as a good faith legal controversy. In any event, we are not prepared to say that the trial court abused its discretion or that its finding of just cause or excuse is without support in the record.

The judgment is affirmed.

APPROVED BY THE COURT.