**Mike EDWARDS, Appellant,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Appellee.**

No. 64046.

Supreme Court of Iowa.

Sept. 17, 1980.

George A. Wilson, III of Dreher, Wilson, Adams & Jensen, Des Moines, for appellant.

Tom W. George of Christianson, Hohnbaum & George, Des Moines, for appellee.

Considered by REYNOLDSON, C. J., and LeGRAND, HARRIS, McCORMICK and LARSON, JJ.

LARSON, Justice.

This plaintiff brought suit against defendant insurance company to recover for the loss of an automobile alleged to be by theft. The plaintiff, Mike Edwards, had advertised his automobile for sale. One Steven J. Davis responded to the ad and after some negotiations on price, agreed to buy it. Edwards signed the title and gave it to Davis, along with the possession of the car. Davis gave him a check for $3400 which was returned marked "insufficient funds." Apparently neither Davis nor the car has been seen since. Edwards sought recovery under the "comprehensive" coverage of his policy insuring against loss by theft. The insurer contended the loss was not by "theft" and alternatively, the loss

was not covered because the policy excluded coverage if the vehicle was under a "conditional sale, purchase agreement, mortgage or other encumbrance." The trial court concluded the loss was not by "theft" as that term was used in the policy and that, in any event, the exclusions were applicable. Following a trial on stipulated facts, the court entered judgment for the insurer. We reverse and remand for entry of judgment for the plaintiff.

I. *"Theft" coverage.* The policy provided comprehensive coverage as follows:

COVERAGE D–COMPREHENSIVE

(1) The Owned Motor Vehicle. To pay for loss to the owned motor vehicle EXCEPT FOR LOSS CAUSED BY COLLISION but only for the amount of each such loss in excess of the deductible amount, if any, stated in the declaration applicable thereto. The deductible amount shall not apply to loss caused by a fire or by a *theft* of the entire vehicle. Breakage of glass, or loss caused by missiles, falling objects, fire, *theft*, larceny, explosion, earthquake, windstorm, hail, water, flood, malicious mischief or vandelism, riot or civil commotion or colliding with birds or animals shall not be deemed to be loss caused by collision. (Emphasis added.)

The trial court found that the acquisition of the car was by fraudulent means but held this was not theft under the policy. It relied in part on case law from other jurisdictions holding that

the popular definition of "theft" carries the import of a trespass and is not applicable where one intends to voluntarily transfer not merely possession but title to property.

*Great American Indemnity Co. v. Yoder*, 131 A.2d 401, 403 (D.C.Mun.App.1957); *see Boggs v. Motors Insurance Co.*, 139 A.2d 733, 734 (D.C.Mun.App.1958). The trial court further supported this viewpoint by referring to *Cedar Rapids National Bank v. American Surety Co.*, 197 Iowa 878, 195 N.W. 252 (1923), where the court held that a theft provision in an insurance policy did

not encompass a loss occurring as a result of a fraudulent act:

> [I]f the wrongdoer fraudulently induce the injured party to surrender to him, not simply the temporary possession of the property, but the absolute *title to and possession* of the property, then his offense is that of obtaining property by false pretense, and not that of larceny.

*Id.* at 882, 195 N.W. at 254–55.

At the outset, we note that the *Cedar Rapids National Bank* case was expressly overruled in *Steinbach v. Continental Western Insurance Co.,* 237 N.W.2d 780, 783 (Iowa 1976). In that case a forged check had been received for cattle sold and a claim was made under the seller's "blanket" farm policy providing this coverage:

> (i) Theft: Coverage on property insured in this form is extended to include direct loss by theft, excluding mysterious disappearance, inventory shortage, wrongful conversion, embezzlement and escape.

In *Steinbach,* as in this case, the insurer contended theft was synonymous with larceny and did not encompass the taking for use of a fraudulent check. The court concluded that loss of the cattle was by theft within the coverage of the policy. The court noted the split of authority on whether theft was to be applied in such cases in a broader sense than the traditional common-law concepts requiring a trespass. In concluding that theft under the policy covered loss by trick or false pretenses, it cited authorities in other jurisdictions, and also quoted with approval from *Long v. Glidden Mutual Insurance Association,* 250 N.W.2d 271, 273 (Iowa 1974) where this court said "the term 'theft' is not defined in the policy. It thus has its popular meaning as a word of general and broad connotation covering any wrongful appropriation of another's property to the use of the taker."

A perusal of the case law from other jurisdictions also reveals this split of authority. *See generally Annot., What Amounts to Theft Property or Pilferage Within Automobile Theft Policy,* 48 A.L.R.2d 8 (1956). Generally, the cases relied upon by the trial court, *Great American*

*Indemnity Co.* and *Boggs,* represent the traditional, restrictive interpretation of theft, while more recent cases have broadened its definition. *See Modern Sounds & Systems, Inc. v. Federated Mutual Insurance Co.,* 200 Neb. 46, 262 N.W.2d 183 (1978); *Ruduloph v. Home Indemnity Co.,* 138 N.J.Super. 125, 350 A.2d 285 (1975); *Gomez v. Security Insurance Co. of Hartford,* 314 So.2d 747 (La.1975); *Farm Bureau Insurance Co. v. Carr,* 215 Kan. 591, 528 P.2d 134 (1974); *State Farm Automobile Insurance Co. v. Valentine,* 29 Ohio App.2d 174, 279 N.E.2d 630 (1971); *Munchick v. Fidelity & Casualty Co. of New York,* 2 Ohio St.2d 303, 209 N.E.2d 167 (1965).

The diversity of views, including that of our own court in *Cedar Rapids National Bank* and *Steinbach,* demonstrates that the question of what constitutes theft is a troublesome one, and that the term has some fluidity in its application. Our legislature now has placed all similar acts including fraudulent practices into the general category of theft. Chapter 714, The Code. While it may be argued this definition has no bearing here since the act was passed but not effective at the time of this event, it at least shows the amenability of the term theft to a broader application than mere larceny.

In the policy in question, theft is not defined. Lay persons cannot reasonably be expected to have a uniform understanding of how broadly the term will be applied when courts do not even agree on it. This is, in fact, the common thread running through the cases such as *Steinbach.* When the insurance company drafting and furnishing the policy of insurance had an opportunity to adequately define theft and failed to do so, it ran the risk that a court would adopt from those alternatives available the one which is most favorable to the insured. *See Steinbach,* 237 N.W.2d at 782; *City of Spencer v. Hawkeye Security Insurance Co.,* 216 N.W.2d 406, 408 (Iowa 1974). Most lawyers, we assume, would discern a difference between the traditional concept of theft and obtaining money by fraudulent practices. Many would, perhaps, assume a

loss through fraud would not be covered as a theft. But an average insured contemplating the loss of property through a fraudulent scheme could reasonably view this as a theft. If the insurance company had desired to avert such reasonable expectations, it should have said so clearly and understandably in the policy. *See C. & J. Fertilizer, Inc. v. Allied Mutual Insurance Co.*, 227 N.W.2d 169, 177 (Iowa 1975).

█ When an insurer has failed to clearly proscribe coverage for loss through fraud, it will likely be bound by a broad interpretation of theft:

> Insurance against theft must be given a fair and reasonable interpretation to cover the risks which the parties had reason to anticipate and to believe would be met by the policy; and where the word "theft" is used in an insurance policy, without definition, it should be interpreted as liberally as possible to protect the insured. The word "theft" in an insurance policy against loss by burglary, larceny or theft, is a broader term than "larceny," and includes any wrongful deprivation of property of another, including embezzlement or swindling.
>
> Specifically, with regard to the risks covered by the insurance, the taking of insured property or jewelry from the insured by trick or fraudulent representation is held to be larceny or the theft within the meaning of a policy insuring against it.

44 Am.Jur.2d "Insurance" § 1399 at 242–43 (1969).

The policy here not only failed to exclude the fraudulent scheme by definition or limitation; it is susceptible to a broad reading of the term theft by its own provisions. First, it could be seriously argued that theft and larceny were not intended to be synonymous, because the policy uses both terms, referring to "[b]reakage of glass, or loss caused by missiles, falling objects, fire, *theft, larceny,* explosion . . . ." in Coverage D. Also, as discussed in the following division, exclusion (e) provides that comprehensive coverage under Coverage D shall not apply to losses due to "conversion, embez-

zlement or secretions" under certain circumstances. If the theft and larceny terms of Coverage D could not be construed to include these other illegal acts, there would be no reason to have this exclusion. *See Modern Sounds & Systems, Inc. v. Federated Mutual Insurance Co.*, 200 Neb. 46, 262 N.W.2d 183 (1978). In *Modern Sounds*, an "insufficient funds" check was given in return for the insured's automobile. In response to the insurer's argument that theft should be narrowly construed to mean larceny, the Nebraska court stated:

> The [insurer] obviously considered the term "theft" to be much broader than larceny because it specifically excluded from the theft coverage of the policy "loss or damage due to conversion, embezzlement or secretion by any person in possession of a covered automobile under a bailment lease, conditional sale, purchase agreement or other encumbrance." In an insurance policy an exclusion is a provision which eliminates coverage where, were it not for the exclusion, coverage would have existed . . . . The explicit exclusion of those enumerated acts, none of which would have been larceny at common law, indicates that the term "theft" was used in a broad sense.

200 Neb. at 50, 262 N.W.2d at 186 (citation omitted).

█ The trial court found fraud; and it has been conceded by the insurer here that the car was obtained by fraudulent means. Thus, this matter may be resolved as a matter of law without the necessity of inquiring whether the requisite elements of a fraudulent act are established in the record. We conclude the trial court erred in holding that this loss was not covered under the theft provision of the policy.

█ II. *The Exclusions.* The second basis for the trial court's decision involved these policy exclusions:

> This Insurance Does Not Apply Under
> . . . .
> (c) Coverage D . . . .
> (3) While the Owned Motor Vehicle is subject to any bailment lease, *conditional*

*sale, purchase agreement,* mortgage or other encumbrance, not declared in this policy;

. . . . .

(e) Coverage D .... to loss due to conversion, embezzlement or secretion by any person in possession of the owned motor vehicle under a bailment lease, *conditional sale, purchase agreement,* mortgage or other encumbrance. (Emphasis added.)

The trial court held that, assuming the transaction between the plaintiff and Mr. Davis amounted to a theft, the transaction was embraced by both exclusions. The insurer contends that the retention of title as a means of security is the gist of a "conditional sale" and that, where a check is given, title does not pass until it is presented and honored, making the transaction in the interim a conditional sale. The insurer relies upon two Iowa cases, *Crescent Chevrolet Co. v. Lewis,* 230 Iowa 1074, 300 N.W. 260 (1941) and *Watson Bros. Realty v. Associates Corp.,* 246 Iowa 483, 66 N.W.2d 384 (1955), which considered whether the purchase of an automobile by check was a "cash sale," in which title passed upon honoring of the check rather than upon mere delivery of the check and receipt of the automobile. The court in *Crescent Chevrolet* said "when a buyer gives a check or draft for the purchase price and it is accepted by the seller as the means of payment, it constitutes only a conditional payment and as between the parties, payment does not become absolute and title does not pass until the paper is paid." 230 Iowa at 1077–78, 300 N.W. at 262. The holding in *Watson Bros.* was essentially the same. The insurer asserts that these cases establish the proposition that payment by check results in a conditional sale. However, conditional payment is not the equivalent of conditional sale, as that term is used in the policy. Reference in the exclusion to "conditional sale, purchase agreement, mortgage or other *encumbrance*" supports that view. Under the doctrine of *noscitur–a–sociis,* the phrase conditional sale must be defined in the context in which it is found.

2A Sutherland, *Statutory Construction* § 47.16, at 101 (C.Sands ed.1973). Reading conditional sale in connection with the associated words–"mortgage or other encumbrance"–leads to the conclusion that it means an express, mutual agreement for a security interest in the seller, not a voidance of a supposedly completed sale by failure of the consideration. For the same reason, the rule that a thief does not obtain title to stolen goods does not make this a conditional sale, as argued by the insurer. In short, this is not the sort of security arrangement connoted by the language of the exclusion.

■ The exclusion also excepts coverage of the automobile subject to a "purchase agreement." The insurer contends, and the trial court held, that the transaction here fell into that category. We do not agree; the phrase apparently refers to an executory contract while this transaction was completed. In examining the purchase agreement and conditional sale arguments of an insurer in a similar case, the Kansas Supreme Court concluded:

The [insurer] singles out the term "purchase agreement" and asserts that it describes the contract between [the insured–seller] and [the wrongdoer–buyer]. We do not so read the term when it is taken in context. It is, it will be noted, one of four specifically named contractual arrangements followed by the catch–all "or other encumbrances." Each of the other three specific arrangements encompasses an executory contract where more than one party has an interest in the car at the same time, viz: lessor–lessee; conditional vendor–conditional vendee; mortgagor–mortgagee. These, and likewise any "other encumbrance" all contemplate possession of the car in one party while the other has an interest evidence by either title or some sort of lien or encumbrance. We cannot believe the term relied on by the [insurer], inserted in the middle of the other four, was intended to mean anything so radically different from its fellows as the [insurer] would suggest.

*Farm Bureau Mutual Insurance Co. v. Carr,* 215 Kan. 591, 595–96, 528 P.2d 134, 138–39 (1974).

There is another, perhaps more compelling, reason why these exclusions are not applicable here: their meaning is not clear, and for the reasons discussed in Division I they must be interpreted in the manner most favorable to the insured. The trial court erred in applying the exclusions.

The case is reversed and remanded for entry of judgment for the plaintiff.

REVERSED AND REMANDED.