649 P.2d 284

**Ronald and Georgia M. ALMADOVA, Plaintiffs-Appellees,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a foreign corporation, Defendant-Appellant.**

No. 15841.

Supreme Court of Arizona, En Banc.

July 28, 1982.

82

Combs, Stone & Wright by Ronald A. Kershaw, Jr., Phoenix, for plaintiffs-appellees.

Hofmann, Salcito & Stevens by James W. Fritz, Phoenix, for defendant-appellant.

FELDMAN, Justice.

Appellant, State Farm Mutual Automobile Insurance Company (State Farm), appeals a decision of the trial court which granted the motion for summary judgment filed by appellees, Ronald and Georgia Almadova (Almadova), on an insurance claim Almadova had brought against State Farm. We have jurisdiction pursuant to Rule 19(e), Rules of Civil Appellate Procedure, 17A A.R.S.

## FACTS

State Farm had insured Almadova's 1976 Porsche automobile by a policy which contained theft coverage. On September 11, 1979, Almadova agreed to sell the car to the Fairchild Car Company, which at that time operated a used car lot in Phoenix. On that date, Almadova signed the title to the car and gave possession of the signed title and the car to David Raines, the president of Fairchild.[1] Contemporaneously, Raines tendered Fairchild's check, payable to Almadova in the amount of $14,000.

Almadova presented the check to the bank on the next day, but it was dishonored because of insufficient funds in the Fairchild account. The following day, Almadova confronted Raines with the dishonored check. According to Almadova, Raines acknowledged that he had been aware that the check would not be honored, and then gave Almadova a second check for the same amount. This check was drawn on the account of the Specialty Car Company. Almadova later presented this second check to the bank on two separate occasions, but it was dishonored both times.

Some time later, Almadova unsuccessfully attempted to regain possession of the car from Raines and Fairchild Car Company. Almadova eventually found that Fairchild had gone out of business and has been unable to locate the vehicle.

Almadova then made a claim under the theft coverage contained in the State Farm policy, and when it was rejected, filed the instant action for recovery under that coverage.

The policy contains two provisions relevant to this case. They are:

Loss to your car. We will pay for the loss to your car ... in excess of the deductible amount, ... caused by ... theft, larceny ...

THERE IS NO COVERAGE FOR:

\* \* \* \* \* \*

3. Loss to any vehicle due to ... 
d. Conversion, embezzlement or secretion by any person who has the vehicle due to any lien, rental or sales agreement.

In the motion for summary judgment, Almadova requested the trial court to find as a matter of law that the loss of the car fell within the coverage for "theft" but not within the provision excluding coverage for loss resulting from "conversion, embezzlement or secretion by any person" who had possession of the vehicle due to a sales agreement. State Farm argued that there was a question of material fact with respect

---

[1] In the motion for summary judgment, Almadova claimed that the title was signed over to Fairchild, but in the brief, Almadova claims it was signed to Raines.

to whether the loss had resulted from "theft," and also filed a cross-motion for summary judgment, contending that because Raines had obtained possession as a result of a sales transaction with Almadova, the loss was within the exclusion as a matter of law. The trial court denied State Farm's cross-motion for summary judgment, granted Almadova's motion, and entered judgment for Almadova. State Farm appeals. We must decide, therefore, whether a loss which occurs as the result of the insured's transfer of possession and title to a putative vendee who tenders a "bad check" for the purchase price is a "theft" within the coverage granted by the policy. If the "theft" coverage does apply, we must then decide whether the transaction is a loss resulting from a "conversion, embezzlement or secretion" of the vehicle by a person who had possession "due to" a "sales agreement." We conclude that neither question can be answered as a matter of law on the record before us, and therefore reverse the judgment in favor of Almadova and remand the matter for proceedings consistent with this opinion.

## THEFT COVERAGE

We note at the outset that there is much dispute in the cases on whether theft coverage applies when the insured voluntarily relinquishes possession of the automobile but is induced to do so through the fraudulent acts of a purported "purchaser." *See* Annot. *Automobile Theft Policy—Coverage*, 48 A.L.R.2d 8 (1956). On the other hand, it is clear that the exclusionary language in the policy before us excludes from coverage the loss of an automobile when possession of the car is delivered to some third person as part of a bona fide sale, but the vendee later fails to pay and does not return the car. *Id.* at 72–97.

Pointing out that Raines gained possession through the tender of a check which he knew would be dishonored, Almadova argues that there is a "theft" where the "buyer" obtains possession by a fraudulent device with intent to permanently deprive the owner of the property. Thus, Almadova

claims, the facts fit the definition of "theft" either under the common law or under our statutory definition of theft (A.R.S. § 13–1802), so that the loss falls within the coverage.

State Farm argues, on the other hand, that a "theft" must include a "trespass" both at common law and in the common understanding of that term, so that the concept of theft does not include a voluntary delivery of possession and title, even when such delivery was induced by false pretenses. *See General Accident Fire & Life Assurance Corp. v. Denhardt*, 253 A.2d 450, 451 (D.C.App.1969).

■ We note that the policy does not define "theft." The word has many possible meanings; for example, it may mean conduct defined as theft by our criminal statutes. If so, our criminal code contains definitions of theft so broad as to include the common law crimes of theft, larceny, obtaining by false pretenses, embezzlement and receiving stolen property. *See* A.R.S. § 13–1802(A). On the other hand, at common law the crime of theft was different from embezzlement, obtaining by false pretenses and the other crimes listed in A.R.S. § 13–1802(A). Thus, it is apparent that the word "theft," without further definition in the policy, is susceptible of various interpretations and is, therefore, ambiguous. *See Sparks v. Republic National Life Insurance Co.*, 132 Ariz. 529, 647 P.2d 1127 (1982). As the Florida Supreme Court has noted,

The word "theft" . . . has been variously defined by courts of other jurisdictions in construing the "theft" provisions of insurance policies. Some courts have stated that this provision means theft as common thought and common speech would now imagine it; that it should be given the usual meaning and understanding accorded it by persons in the ordinary walks of life. . . .

＊ ＊ ＊ ＊ ＊

As stated in *Toms v. Hartford Fire Ins. Co.*, supra, [146 Ohio St. 39, 63 N.E.2d 909, 911] "We think it may be accurately said that to 'the man on the street' the

word 'theft' is of broader scope than 'larceny' and comprehends essentially the wilful taking or appropriation of one person's property by another wrongfully and without justification and with the design to hold or make use of such property in violation of the rights of the owner. In our opinion, where the word 'theft' is used in an insurance policy, without definition, it should be interpreted as liberally as possible to protect the insured."

This court is committed to the rule that a contract of insurance prepared and phrased by the insurer is to be construed liberally in favor of the insured and strictly against the insurer, where the meaning of the language used is doubtful, uncertain or ambiguous.... And where, as here, a policy under a theft provision described as "Broad Form" provides coverage for loss or damage due to "theft, larceny, robbery, or pilferage," it requires no great liberality of construction to hold that the insurer intended to provide coverage for losses in addition to those which are, by strict common-law definition, larceny.

*Fireman's Fund Insurance Co. of San Francisco v. Boyd*, 45 So.2d 499, 500–01 (Fla. 1950) (citations omitted).

Our court of appeals has given the following interpretation to the word "theft" in an insurance policy:

The modern trend today, where the word "theft" is not defined in the insurance policy, is to give it a liberal construction, namely a common and ordinary meaning according to the understanding of persons in ordinary walks of life.... The term "theft" has been construed to include any wrongful deprivation of the property of another without claim or color of right, ... the fraudulent and wrongful taking of the property of another...

*Pacific Indemnity Co. v. Kohlhase*, 9 Ariz. App. 595, 598, 455 P.2d 277, 280 (1969) (citations omitted)[2]  *But see, e.g., Boggs v. Mo-*

tors Insurance Corp., 139 A.2d 733 (D.C. App.1958); Annot., *supra*. We believe the rule formulated in *Pacific Indemnity Co. v. Kohlhase, supra*, is the more modern and better rule. The rule recognizes the inherent ambiguity of the word "theft" in an insurance policy which contains no further definition, and adopts a definition more in tune with the common usage of the word "theft."

█ We hold, therefore, that where the terms "theft" or "larceny" are used in the grant of coverage in an automobile insurance policy, but are not clearly defined or limited, they are ambiguous and should be interpreted broadly to include a loss caused by any unlawful or wrongful taking of the insured vehicle with criminal intent, whether or not such taking technically qualifies as embezzlement, theft or larceny at common law. *See Farm Bureau Mutual Insurance Co. v. Carr*, 215 Kan. 591, 594, 528 P.2d 134, 138 (1974); *Modern Sounds & Systems v. Federated Mutual Insurance Co.*, 200 Neb. 46, 50, 262 N.W.2d 183, 187 (1978); *Rudolph v. Home Indemnity Co.*, 138 N.J.Super. 125, 136, 350 A.2d 285, 292 (1975); *Munchick v. Fidelity & Casualty Co. of New York*, 2 Ohio St.2d 303, 305–06, 209 N.E.2d 167, 170 (1965). Therefore, if Raines-Fairchild took possession of the car with a present intention not to pay for it, the loss would be within the coverage of the policy.

## THE POLICY EXCLUSION

State Farm claims that the transaction between Almadova and Raines was essentially a sale, that possession was voluntarily given by Almadova and taken by Raines "due to" the "sales agreement" so that the subsequent conversion, embezzlement or secretion of the vehicle by Raines or Fairchild Car Company was expressly excluded by the policy. Almadova contends, on the other hand, that Raines' fraudulent intent prevented the formation of a valid sales agree-

---

**2.** The case involved theft coverage on an airplane which was lost when, without the owner's permission, a student pilot was allowed by the airport manager to take the insured's airplane on a cross-country flight. The court held

the loss was not covered by insurance for theft because it was apparent that at the time of the crash the student thought he had permission to use the airplane.

ment. Since the agreement was not valid, Almadova argues, Raines' possession was "due to" a fraud, i.e., theft, not a "sales agreement," so that the exclusion is inapplicable. Under Almadova's view, the exclusion would be applicable only when the third party obtained possession of the vehicle without criminal intent, but later formed such intent and failed to return or pay for the car.

There is abundant authority for both propositions. *Cf., e.g., Great American Indemnity Co. v. Yoder*, 131 A.2d 401 (D.C. App.1957) (applying the exclusionary language to a fact situation similar to the case at bench) *with Massachusetts Fire & Marine Ins. Co. v. Cagle*, 214 Ark. 189, 193, 214 S.W.2d 909, 911 (1948) (holding the exclusion inapplicable because there was "never actually any sale of the car" since the buyer's knowing use of a bad check vitiated the transaction).

We believe that the exclusionary language under consideration falls somewhat short of covering the precise situation presented here. It is a situation which can easily be handled by appropriate wording. *See, e.g., Galloway v. Marathon Insurance Co.*, 220 Ark. 548, 549, 248 S.W.2d 699, 700 (1952) (policy excluded from coverage "any theft ... that is caused by any person to whom the [insured] voluntarily parts with title and/or possession, whether or not induced so to do by any fraudulent scheme, trick, device, or false pretense"); *Rolfsmeier v. Implement Dealers Mutual Insurance Co.*, 182 Neb. 150, 152, 153 N.W.2d 367, 368 (1967) (a supplement to the policy contained a similar clause to the one in *Galloway, supra*, so that a transaction similar to that before us was held excluded from the theft coverage); *Pacific Indemnity Co. v. Harrison*, 277 S.W.2d 256, 257 (Tex.Civ.App.1955) (exclusionary clause similar to one in *Galloway, supra*).

The language used here is not so unambiguous and clear as that used in the exclusions quoted in the cases just cited. There

are a number of cases holding that exclusions similar to that under consideration here are inapplicable when the putative purchaser acquires possession through a fraudulent device such as the knowing tender of a "bad check." *See, e.g., Massachusetts Fire & Marine Ins. Co. v. Cagle*, 214 Ark. at 193, 214 S.W.2d at 911; *Farm Bureau Mutual Ins. Co. v. Carr*, 215 Kan. at 597, 528 P.2d at 138; *Bomar v. Insurors Indemnity & Insurance Co.*, 150 Tex. 484, 242 S.W.2d 160, 163 (1951). In each of these cases, however, the exclusion applied only when the third party had obtained "lawful" possession due to a sale or other type of agreement. The exclusion here is broader, since it makes no express difference whether the third party obtained "lawful" possession or not.[3] A similar clause was construed in *Modern Sounds & Systems v. Federated Mutual Ins. Co., supra*, to be inapplicable to a transaction such as that which took place between Almadova and Raines because, the court noted, the exclusion was aimed only at transactions which were continuing in nature so that two or more persons had concurrent legal interests in the car. Thus, the court held the exclusion would be inapplicable to completed transactions where the "buyer" obtained possession by fraud.

In our view, the best reasoned case on the effect of the exclusion is *Farm Bureau Mutual Ins. Co. v. Carr, supra*. There, the court discussed two separate exclusionary clauses. One excluded coverage when the automobile was lost after it had become "subject to" any conditional sale or purchase agreement (plus a variety of other transactions); the other excluded coverage if the vehicle was lost when, after a transfer of possession, there was a subsequent conversion, embezzlement or secretion by a person in "lawful possession." The court indicated that the clauses, construed together, eliminated coverage when the person who caused the loss acquired such possession as would probably have caused him to

---

3. The exclusion applies to the wrongful acts of "any person who has the vehicle due to any ... sales agreement."

purchase his own theft coverage or where he has taken the vehicle lawfully and later formed a criminal intent while still indebted to the insured. *Id.* 215 Kan. at 596–97, 528 P.2d at 138–39. Even though there is some difference between the exclusionary language, we believe that the principles of the *Carr* case best fit the situation presented by the policy in question here. Construing together the extension of coverage for "theft" and "larceny" and the exclusion of coverage for transfers of possession due to any sales agreement, we conclude that the intent of the policy is to provide coverage to the insured for any loss resulting from an initial wrongful taking or transfer of possession achieved by a preconceived, fraudulent device or criminal intent (the grant of coverage for theft and larceny), but not to losses which occur when the transferee takes lawful possession but later forms a dishonest, criminal intent (conversion, embezzlement or secretion by any person who has the vehicle due to any lien, rental or sales agreement). Thus, if Raines obtained possession of the car from Almadova due to a preconceived, fraudulent plan, that is, with an initial intent to defraud Almadova (*e.g.*, take possession of the car by false representations—the check—and deprive Almadova of his property), there is coverage and the exclusion is not applicable. If, however, Raines did not have an initial fraudulent or criminal intent but only formed such an intent later, or did not form one at all, then the exclusionary language would control and there would be no coverage. *Farm Bureau Mutual Ins. Co. v. Carr, supra.*

## PROPRIETY OF SUMMARY JUDGMENT

■ Under this interpretation of the policy, it is apparent that the trial court erred in granting summary judgment to Almadova. On the record before us, all that is known of Raines' intent is that he delivered a check and allegedly later made a comment which indicated that he had known at

the time that the check would not be good. We know nothing else about what his intentions were,[4] nor do we know why Fairchild Car Company went out of business, whether they were engaged in a scheme to deprive Almadova and others of their cars, etc. Certain inferences of criminal intent can, of course, be made from Raines' knowing tender of a bad check. Contrary inferences are possible. Resolution of conflicting inferences are for the trier of fact, not for the court on motion for summary judgment. *See Northern Contracting Co. v. Allis-Chalmers Corp.*, 117 Ariz. 374, 376, 573 P.2d 65, 67 (1977). The parties have not argued, and we have not considered or decided whether the mere knowing delivery of a bad check is a fact which, without more, in and of itself will justify the final inference that Raines had a criminal intent at the time of taking possession.

> The plaintiff must establish the existence of [the buyer's] criminal intent by a preponderance of the evidence only and not beyond a reasonable doubt. See Annotation, 48 A.L.R.2d, § 14, p. 51. The fact that the buyer of an automobile issues and delivers an insufficient funds check in payment of the purchase price does not of itself establish criminal intent in a case such as this. On the evidence in this case, however, the factfinder could reasonably have found either that there was, or that there was not, the requisite criminal intent at the time of the taking. That issue cannot be determined as a matter of law and the judgment must therefore be reversed and the case remanded for a new trial.

*Modern Sounds & Systems v. Federated Mutual Insurance Co.*, 200 Neb. at 52–53, 262 N.W.2d at 187.

Accordingly, the judgment in favor of Almadova is reversed and the case is remanded to the trial court for proceedings consistent with this opinion.

HOLOHAN, C. J., GORDON, V. C. J., and HAYS and CAMERON, JJ., concur.

---

4. Raines may have intended to cover the check by making a deposit before the check reached the drawee, may have thought the second check was good, etc.