694 P.2d 800

**AMERICAN NATIONAL FIRE INSURANCE COMPANY, a foreign corporation, and Great American Insurance Company, a foreign corporation, Plaintiffs/Appellants,**

**v.**

**ESQUIRE LABS OF ARIZONA, INC., an Arizona corporation; Esquire For Men, Inc., an Arizona corporation; Esquire For Men of Phoenix, Inc., an Arizona corporation; Sol Behar and Elayne Behar, husband and wife; Daniel Singer and Paula Singer, husband and wife; Francisco Azcona Astiazaran; Otto Binder; Salvador Carrasco-Toriz; Fernando Esquer; Servando Gonzales Garcia; Rodolfo Gonzalez-Burgueno; George T. Gregory, Jr. and Nina Gregory; Rayburn Bryan Jones; Ramon R. Munoz; Amedo R. Pino; Tim Rollins; Francisco Mendoza Salvatierra; James L. Stonebreaker and Janice Stonebreaker; Granger L. Vinall; Kenneth F. Wagner and Barbara Wagner; and Walter J. Warren, Defendants/Appellees.**

**No. 2 CA-CIV 4935.**

Court of Appeals of Arizona,
Division 2.

July 9, 1984.

Reconsideration Denied Sept. 25, 1984.

Review Denied Jan. 8, 1985.

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears, P.A. by George H. Mitchell, Redfield T. Baum and Larry L. Smith, Phoenix, for plaintiffs/appellants.

D'Antonio & D'Antonio, P.C. by Patricia A. Ihnat, Tucson, for defendants/appellees Esquire Labs of Arizona, Esquire for Men, Esquire for Men of Phoenix, Behar and Singer.

DeConcini, McDonald, Brammer, Yetwin & Lacy, P.C. by David C. Anson and Michael R. Urman, Tucson, for defendant/appellee Gonzalez-Burgueno.

Donald Estes, Tucson, for defendants/appellees Salvatierra, Garcia, Rollins, Warren, Pino and Carrasco-Toriz.

Haralson, Kinerk & Morey, P.C. by William H. Ricker, Tucson, for defendants/appellees Stonebreaker, Wagner and Gregory.

Richard D. Burris, Tucson, for defendants/appellees Binder, Esquer, Astiazaran and Vinall.

## OPINION

BIRDSALL, Chief Judge.

Some of the facts giving rise to the litigation involved in this appeal are before this court for at least a third reported time. *See Gonzalez-Burgueno v. National Indemnity Company,* 134 Ariz. 383, 656 P.2d 1244 (App.1982) and *Salvatierra v. National Indemnity Company,* 133 Ariz. 16, 648 P.2d 131 (App.1982).

This appeal results from a declaratory judgment action commenced by appellants American National Fire Insurance Co. and Great American Insurance Co., foreign corporations, seeking to have the trial court determine that they afforded no coverage for sixteen judgments entered in Pima County Superior Court. The judgments were in favor of appellees Astiazaran, Binder, Carrasco-Toriz, Esquer, Garcia, Gonzalez-Burgueno, Gregory, Jones, Munoz, Pino, Rollins, Salvatierra, Stonebreaker, Vinall, Wagner, and Warren. The judgments were against the appellees Esquire Labs of Arizona, Inc. (Labs) and Esquire for Men, Inc. (Men), both Arizona corporations doing business in Tucson, and their principal officers, Sol Behar (and spouse) and Daniel Singer (and spouse). No judgments were entered against a third corporation, Esquire for Men of Phoenix, Inc. (Phoenix). That company is, however, an appellee here since the judgment in the declaratory judgment action included it. All of the other sixteen individual male appellees were customers of Labs and Men who sustained personal injury as a result of the negligence of the two companies.

Two other parties having claims against Labs, Men, Behar and Singer were named in the appellants' original complaint, Michael Clark and Norman Jones. Their cases were pending in Pima County. They did not have judgments and their cases were settled and dismissed during this litigation.

The complaint also named James J. Ponegalek as a defendant alleging that he had an action pending in Maricopa County. He was never served with summons and complaint and he never appeared in the declaratory judgment action. The only document filed on his behalf was a notice filed March 9, 1983 by his attorneys Langerman, Begam, Lewis and Marks, requesting copies of all minute entries and documents. This was long after the trial. The judgment giving rise to this appeal was entered November 18, 1982. Nevertheless the trial court made findings and conclusions concerning Ponegalek and the judgment in favor of "the defendants" on the complaint

presumably includes him. We agree with the appellants that we cannot affirm the judgment as to Ponegalek. The trial court had no jurisdiction over his person. The judgment as to him is void. Cf. *O'Leary v. Superior Court of Gila County*, 104 Ariz. 308, 452 P.2d 101 (1969); *McDonnell v. Southern Pacific Company*, 79 Ariz. 10, 281 P.2d 792 (1955).

In the declaratory judgment action from which this appeal is taken, the trial court entered judgment declaring that the appellants' policies of insurance issued to Labs, Men and Phoenix provided coverage for the three companies, Behar and Singer. The trial court also awarded each of the appellees attorneys fees and costs for defending the action and awarded the three companies, Behar and Singer damages in the form of their attorney fees for breach of the insurance contracts. The trial court found the appellants were obligated to defend the various lawsuits.

Other facts necessary to an understanding of this controversy are contained in the following findings of the trial court[1] which were entered pursuant to Rule 52(a), Rules of Civil Procedure, 16 A.R.S.:

"1. Beginning in 1978 and continuing throughout 1979, defendant, Esquire Labs of Arizona, Inc., conducted business at its premises located at 301 [sic] North Wilmot, Tucson, Arizona.

2. Esquire Labs advertised, offered for sale and performed a process known as Hairegenics.

3. The Hairegenics process consisted primarily of the surgical implantation of artificial hair-like fibers into the human scalp.

4. The surgical portion of the Hairegenics process was performed by employees and independent contractors of Esquire Labs on its premises at 301 [sic] North Wilmot, Tucson, Arizona.

5. Defendant, Esquire for Men, Inc., advertised the Hairegenics process and of-

fered it for sale from the premises located at 1066 North Campbell, Tucson, Arizona.

\* \* \*

7. Following the insertion of the fibers at the premises of Esquire Labs, the customers were sent to the Esquire for Men, Inc., ... where employees of the Esquire for Men, Inc., ... shampooed and trimmed both the fibers and the natural hair.

8. Defendant, Sol Behar, is the president of Esquire for Men, Inc., ... and is the president of Esquire Labs of Arizona, Inc.

9. Defendant, Daniel Singer, is the vice-president of Esquire for Men, Inc., ... and is the vice-president of Esquire Labs of Arizona, Inc.

10. Sol Behar and Daniel Singer were, at all times material to this action, employees of the Esquire for Men, Inc., ... and of Esquire Labs of Arizona, Inc.

11. The plaintiffs issued a policy of insurance, policy BP1320736, to Esquire Labs of Arizona, Inc., which was a premises/operations policy.

12. The plaintiffs issued an insurance policy, policy BP1314352, to the Esquire for Men, Inc., which is a premises/operation policy.

\* \* \*

14. The defendants, Astiazaran, Binder, Carrasco-Torriz, [sic] ... Esquer, Garcia, Gonzalez-Burgueno, Gregory, ... Rayburn Bryan Jones, Munoz, Pino, Rollins, Salvatierra, Stonebreaker, Vinall, Wagner, and Warren each underwent the surgical portion of the Hairegenics process at the premises of Esquire Labs of Arizona, Inc., located at 301 [sic] North Wilmot, Tucson, Arizona, during 1979. (Each of these defendants above named shall hereinafter be referred to as "Judgment Creditors.")

\* \* \*

20. Copies of the complaints filed by the Judgment Creditors ... were sent to the plaintiffs with a demand that the plaintiffs

---

1. We have set forth all of the findings except some pertaining only to Ponegalek, Phoenix, and the Phoenix policy.

provide a defense and indemnify the insureds under the policies issued to Esquire Labs, Esquire for Men, Inc. ...

21. The plaintiffs reviewed the complaints and the policies of insurance and refused to defend and indemnify Esquire for Men, Inc., ... and Esquire Labs of Arizona, Inc. The plaintiffs refused to pay the costs of defending the actions, including the attorney's fees and the court costs incurred.

22. Each of the Judgment Creditors, excepting only Clark and Norm Jones, was awarded judgment against Esquire for Men, Inc., and Esquire Labs of Arizona, Inc., Behar and Singer.

\* \* \*

24. The plaintiffs refused to pay those judgments and refused to indemnify their insureds based upon their denial of coverage under the respective policies.

\* \* \*

26. The insurance policy BP1320736 issued by the plaintiffs to Esquire Labs of Arizona, Inc., is a fully integrated, unambiguous, and complete agreement between the parties thereto.

27. Policy BP1320736 issued to Esquire Labs states:

'1. The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence, and arising out of the ownership, maintenance or use of the insured premises, and all operations necessary or incidental to the business of the named insured conducted at or from the insured premises, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false, or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim on the judg-

ment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.'

28. Policy BP1320736 contains the following exclusion:

'It is agreed that with respect to any operations described below or designated in the policy as subject to this endorsement, the insurance does not apply to bodily injury or property damage due to rendering of or failure to render any cosmetic, tonsorial, massage, physiotherapy, chiropody, hearing aide, optical, or optometrical services or treatments.
Description of Operations: Hair transplant laboratory.'

29. The term 'hair transplant laboratory' is not defined in policy BP1320736.

30. The plaintiffs introduced no evidence that an artificial fiber implant is encompassed by or included within the term 'hair transplant laboratory.'

31. A hair transplant laboratory is a facility which performs the process of surgically removing a plug of living skin containing living natural hair from one part of the body and surgically placing it in another part of that body.

32. Esquire Labs of Arizona, Inc., was an artificial fiber implant facility.

33. An artificial fiber implant facility is separate and distinct from a hair transplant facility; the term hair transplant does not embrace or include the term artificial fiber implant.

34. The artificial fiber implant process performed by Esquire Labs involved the surgicial insertion of artificial fibers into the scalp, which fibers did not grow and remained as foreign bodies in the scalp.

35. Each of the Judgment Creditors ... underwent the surgical portion of the Hairegenics process at Esquire Labs, which involved the surgical implantation of artificial fibers into the scalp.

36. Each of the Judgment Creditors ... suffered bodily injury during the Hairegenics process.

37. Policy BP1320736 defines bodily injury as follows:

' "Bodily injury" means bodily injury, sickness, or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom.'

38. Policy BP1320736 excluded from coverage the complete operations hazard defined in the policy as follows:

' "Completed operations hazard" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. Operations include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following:

(1) when all operations to be performed by or on behalf of the named insured under the contract have been completed.

(2) when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or

(3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project. Operations which may require further service or maintenance work, or correction, repair, or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.'

39. The Judgment Creditors ... underwent the Hairegenics process consisting primarily of the surgical insertion of artificial fibers during four to five surgical implant sessions over a period of four to six weeks.

40. The Judgment Creditors ... suffered bodily injury during and immediately following each of the artificial fiber implant sessions, and prior to completion of the entire Hairegenics process....

41. The plaintiffs introduced no evidence that the surgical process had been put to its intended use by the Judgment Creditors ... prior to the injuries sustained, or that the 'completed operations' exclusions is applicable.

42. Policy BP1320736 excluded from coverage product hazards defined in the policy as follows:

' "Products hazards" includes bodily injury and property damage arising out of the named insureds products or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs away from premises owned by or rented by the named insured and after physical possession of such products has been relinquished to others.'

43. The Judgment Creditors ... sustained injury on the premises of Esquire Labs located at 301 [sic] North Wilmot, Tucson, Arizona.

44. The plaintiffs introduced no evidence that physical possession of the products involved in the Hairegenics process had been relinquished to others prior to the injuries being sustained by the Judgment Creditors ... or that the 'products hazards' exclusion is applicable.

45. The plaintiffs introduced no evidence that Hairegenics process constituted anything other than the performance of a service.

46. The plaintiffs introduced no evidence that Hairegenics constituted only the sale of a product, or that the 'products hazard' exclusion applies.

47. The insurance policy BP1314352 issued by the plaintiff to the defendant, Esquire for Men, Inc., is a fully integrated, unambiguous, and complete agreement between the parties thereto.

\* \* \*

49. Policy BP1314352 ... state(s) that the plaintiff agrees as follows:

'Coverage B-Bodily Injury Liability-Except Automobile.

To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury caused by an occurrence.'

50. The Hairegenics process was advertised and offered for sale from the premises of Esquire for Men, Inc., located at 1066 North Campbell, Tucson, Arizona, as part of the business operations conducted by the insured, and the plaintiffs introduced no evidence otherwise.

\*     \*     \*

52. The defendants, Sol Behar and Daniel Singer, were at all times employees of the Esquire for Men, Inc., and were at all times acting within the scope of their employment.

\*     \*     \*

54. The defendants, Sol Behar and Daniel Singer, advertised the Hairegenics process and made representations with regard to that process.

55. Behar and Singer were negligent in their advertising and offering for sale of the Hairegenics process in that their activity was below the community standard of care with regard to advertising and offering such products for sale, and the plaintiffs introduced no evidence otherwise.

56. The Judgment Creditors were customers of Esquire for Men, Inc.

\*     \*     \*

58. The Judgment Creditors suffered bodily injury as a result of the negligence of Behar and Singer, and Esquire for Men, Inc., in offering for sale and advertising the Hairegenics process.

\*     \*     \*

60. Policy BP1314352 ... defines bodily injury as follows:

... ' "Bodily injury" means bodily injury, sickness, or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom.'

61. The findings of negligence contained in the judgments entered in favor of the individual Judgment Creditors is not based solely upon the rendering or failure to render any cosmetic, tonsorial, or other such services or treatments, but is also based upon the negligent misrepresentation or advertisement of the Hairegenics process conducted by Esquire for Men, Inc., and the individual insureds.

62. The plaintiffs did not meet the burden of proving that the judgments or claims came within any of the policies' exclusions."

We set forth additional facts in our discussion of the issues which the appellants present on appeal. The appellants contend that:

1) The insurance policies did not insure against the risks giving rise to the judgments and, additionally, specifically excluded such claims.

2) The exclusion of "hair transplant laboratory" in the Labs policy should include the "hair implant" operation.

3) All of the activities of Labs and Men were "professional services" excluded under the policies.

4) Evidence the appellants presented in an offer of proof should have been admitted.

5) The award of $65,000 to Labs, Men, Behar and Singer is unsupported.

We set aside the judgment insofar as it declares the appellants are liable because of Policy No. BP13144325 issued to Esquire for Men of Phoenix, Inc. No findings or evidence supports the conclusions or the judgment pertaining to Phoenix. We further vacate the judgment so far as it purports to include Ponegalek. We reverse the judgment in so far as it declares the appellants are liable because of Policy No. BP1320736 issued to Esquire Labs of Arizona, Inc. and remand for further proceedings consistent herewith. We affirm the judgment insofar as it declares the appellants are liable because of Policy No. BP1314352 issued to Esquire for Men, Inc. We also affirm the judgment insofar as it awards attorney fees and costs to the appellees, including the amounts awarded to

Men, Behar and Singer.[2] We vacate the judgment insofar as it awards fees and costs to Labs. Our reversal as to Labs does not require us to reduce the amounts awarded to Men, Behar and Singer. It does not appear that any specific portion of these expenses is attributable solely to the contention that the Labs policy afforded coverage. It appears that Men, Behar and Singer would have incurred the same expenses with or without the Labs involvement.

■  We note at this point that the record on appeal does not include copies of the underlying judgments in favor of the individual customer appellees. Nor does it contain copies of the complaints in those cases. These judgments and complaints were an exhibit offered by the appellees and admitted into evidence by the trial court. However, the list of exhibits contained in an attachment to the index of the contents of the Superior Court Clerk's Record on Appeal shows this exhibit "not in Clerk's custody". We presume the Clerk complied with that part of Rule 11(a)(2) of the Arizona Rules of Civil Appellate Procedure, 17A A.R.S. (ARCAP) requiring that a copy of the index be served upon all parties to the appeal. We believe it is the responsibility of the parties to examine at least the index of the record furnished on appeal if not the record itself. We believe the several cases decided under prior Rule 3 of the Rules of the Supreme Court concerning the responsibility of the parties for an abstract of the record are applicable. *See St. Paul Fire and Marine Insurance Company v. Central Park Mobile Homes,* 22 Ariz.App. 557, 529 P.2d 711 (1974); *Plymouth Van Lines, Inc. v. Charlson,* 16 Ariz.App. 378, 493 P.2d 924 (1972); *Visco v. Universal Refuse Removal Company,* 11 Ariz.App. 73, 462 P.2d 90 (1969); *In Re Estate of Henry,* 6 Ariz.App. 183, 430 P.2d 937 (1967); *Mozes v. Daru,* 4 Ariz.App. 385, 420 P.2d 957 (1966). In other words, as these cases hold, it is not the responsibility of the court to supplement the appellate record in a civil case where the parties have done nothing in that regard. *See* ARCAP Rule 11(e).

We also note that the appellate record does not contain a complete transcript of all the testimony presented. For example the minute entry for the first day of trial shows Dr. Paul Dempsey testified. The record does not contain a transcript of his testimony. The transcript for the proceedings that day, April 13, 1982, is a "partial transcript of proceedings" only.

■  We will discuss the first three issues together since they are interrelated. The appellants first point out that an insurance policy must be read using the ordinary language of the average layman rather than by using technical medical, legal, insurance or statutory terms. *Mission Insurance Company v. Nethers,* 119 Ariz. 405, 581 P.2d 250 (App.1978); *Malanga v. Royal Indemnity Company,* 101 Ariz. 588, 422 P.2d 704 (1967). From this general statement of law they then argue that the exclusion of a "hair transplant laboratory" in the Labs policy should be read to also exclude the "hair implant" process actually performed by that insured. In finding 31 the trial court found that a transplant involves removing living skin from one part of the body and inserting it in another part of that body. In subsequent findings the trial court found that an implant involved the insertion of artificial fibers in the scalp. These findings are ordinary dictionary language. *See Webster's Third New International Dictionary* where transplant is defined as:

> "... to remove and plant in another place: to lift and reset in another soil or situation; to remove from one location and introduce in another; to transfer (an organ or tissue) from one body or part of a body to another ..."

and implant is defined as:

> "... to insert in a living site for growth, formation of an organic union, or absorption."

---

**2.** These amounts are $65,000.00 (costs of defense), $6,450.00 (attorney fees) and $351.85 (costs).

Neither word is shown to be a synonym of the other.

■ The appellants then argue that the policies covering both Labs and Men were "premises" policies and that professional services were excluded from coverage. They cite cases from other jurisdictions where premises policies containing such an exclusion have been interpreted under the facts presented in those cases. *See Knorr v. Commercial Casualty Insurance Co.,* 171 Pa.Super. 488, 90 A.2d 387 (1952); *Ruggieri v. New Amsterdam Casualty Co.,* 276 App.Div. 1031, 95 N.Y.S.2d 832 (1950); *Harris v. Fireman's Fund Indemnity Co.,* 42 Wash.2d 655, 257 P.2d 221 (1953).

The policies issued to Labs and Men must, however, be examined to see if they are only "premises" policies containing exclusions for professional services.

The Labs policy provides coverage for bodily injury liability with respect to the premises designated, 310 N. Wilmot, the business address of the "laboratory". It contains a "Special Multi-Peril Policy Liability Insurance" form which provides in part that the company will pay damages because of bodily injury caused by an occurrence arising out of the "... ownership, maintenance or use of the insured premises *and all operations necessary or incidental to the business of the named insured conducted at or from the insured premises....*" (emphasis supplied) Several exclusions follow in the form including:

(a) to liability assumed by the insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner.

This form does not exclude professional services.

The policy then contains an endorsement entitled: EXCLUSION (Malpractice and Professional Services):

It is agreed that with respect to any operation described below or designated in the policy as subject to this endorsement, the insurance does not apply to bodily injury or property damage due to the rendering of or failure to render any cosmetic, tonsorial, massage, physiotherapy, chiropody, hearing aid, optical or optometrical services or treatments.

The only operation then described below is: "Hair Transplant Laboratory." The policy does not designate any other operation to be subject to the endorsement.

Thus we return to the argument we have already discussed—the hair transplant includes hair implant theory.

The plain, ordinary reading of the policy, without considering the evidence offered by the appellants, provides coverage for bodily injury liability for the necessary and incidental business operations of Labs with no applicable exclusion.

■ Turning now to an analysis of the Men policy, it contains a "Select Liability Policy" which contains an insuring agreement to pay "... all sums which the insured shall become legally obligated to pay as damages because of bodily injury caused by an occurrence." The only exclusion which the appellants contend excludes coverage to Men under the facts presented here is contained in an article entitled "Exclusion of Malpractice and Professional Services" which reads:

It is agreed that with respect to any operation described in the schedule below or designated elsewhere in the policy as subject to this endorsement, the insurance does not apply to bodily injury or property damage due to the rendering of or failure to render any cosmetic, ear piercing, tonsorial, massage, physiotherapy, chiropody, hearing aid, optical or optometrical services or treatments.

The schedule below then reads: "Description of Operations: BEAUTY PARLORS". Since the declarations in the policy describe the business of Men as a beauty parlor for men this clearly excludes from coverage the negligence apparently found by the trial court in the underlying judgments based upon the rendering or failure to render

cosmetic, tonsorial or other such services or treatments. (Finding 61) However, it would not exclude negligent misrepresentation or advertisement of the Hairegenics process by Men or Behar and Singer as officers and employees of Men. (Finding 58)

The appellants place some reliance on a misstatement found in our opinion in *Salvatierra v. National Indemnity Company, supra,* where we referred to the business of Labs as the performance of "artificial hair transplants". 133 Ariz. at 17, 648 P.2d 131. The difference between transplants and implants was not an issue in that appeal. We erroneously described the business of Labs. The appellants here can take no solace from that mistaken terminology.

The appellants argue further that the judgment creditors, they refer specifically to Gonzalez-Burgueno, were not damaged because of negligent misrepresentations or advertising but rather by the implant process itself. We are bound by the findings of the trial court unless they are clearly erroneous. The appellants' argument seems to be that the evidence before the trial court does not support findings 58 and 61 that the judgment creditors suffered bodily injury as a result of the negligence of Behar, Singer and Men in offering for sale and advertising the Hairegenics process. Where such an argument is made this court would ordinarily review the evidence to determine if it could reasonably support such a finding. *Lenslite Co. v. Zocher,* 95 Ariz. 208, 388 P.2d 421 (1964).

█ In the instant case we must presume, in the absence of a complete record, that there was substantial evidence to support the facts found. *Cheda v. Skinner,* 6 Ariz. 196, 57 P. 64 (1899); *Bliss v. Treece,* 134 Ariz. 516, 658 P.2d 169 (1983). We find a myriad of cases between these years standing for the same proposition. Although the judgments are not before us, we understand from oral argument and the briefs that only the Gonzalez-Burgueno judgment contained a specific finding that the plaintiff was damaged because of the negligent misrepresentations. We also understand that the same trial judge who heard the declaratory judgment action giving rise to this appeal, former Superior Court Judge Robert J. Hooker, presided over all the hearings and entered all of the underlying judgments. For this further reason we believe we are bound by Findings 58 and 61 absent some showing that it is clearly erroneous. Nothing in the record suggests any such error.

We now turn to the evidence offered by the appellants which they contend was erroneously rejected by the trial court. The appellants argue that it established that there was never any intention by either the insurer or insured to cover these risks. They further contend that not only did they not intend to provide such coverage but that no such coverage was obtainable anywhere. They argue that the admission of this evidence would prove that the description of Labs' operations as a hair transplant laboratory, and the exclusion relating to that process, was intended to include the implant process. They assert that the rejection of this evidence was reversible error entitling them to a new trial. We agree as to the judgment against Labs and Behar and Singer as officer-employees of that corporation.

█ Even though the trial court found the insurance policies to be unambiguous, a finding with which we must agree, the offered evidence showed that the only business of Labs was the implant process. According to that evidence, every one involved, Behar, Singer, the insurance agent and the appellant companies, knew this was the only business of the insured. They were not in the "hair transplant business." Behar and Singer were told the risk involved in the hair *implant* business could not and would not be insured. The appellants meant to exclude something by the "hair transplant" exclusion; there would be no reason to exclude an operation which the company was not performing. The purpose of an agreement is to be divined from the entire instrument and *the surrounding circumstances* and not from the

label the parties attach to it. *Smith v. Melson, Inc.*, 135 Ariz. 119, 659 P.2d 1264 (1983). The proof rejected by the trial court was an attempt to prove the circumstances existing at the time the Labs policy was written and this evidence should have been admitted.

The Arizona Supreme Court recently had occasion to apply the contract principle stated in *Melson* in an opinion involving an insurance contract in *Darner Motor Sales, Inc. v. Universal Underwriters Insurance Company*, 140 Ariz. 383, 682 P.2d 388 (1984). The comprehensive analysis in that decision is instructive. While recognizing the parol evidence rule that parties may not vary the terms of a written agreement by introducing evidence contrary to the writing, the court also observed that the rule is not "strictly applied" to enforce a "bargain" that was never really made and would, if applied, defeat the true agreement which was supposedly contained in the policy, citing *Sparks v. Republic National Life Insurance Company*, 132 Ariz. 529, 647 P.2d 1127, *cert. denied*, 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1982) and *Zuckerman v. Transamerica Insurance Company*, 133 Ariz. 139, 650 P.2d 441 (1982). We recognize that the court was, at that point, discussing standardized provisions in insurance policies. Nevertheless the court went on to discuss the law pertaining to non-standardized, negotiated contracts. Although in the instant case we are dealing with a "standardized insurance contract", we view the provision excluding the hair transplant operation as a non-standard negotiated provision in the policy. We say "negotiated" because the offer of proof shows discussion of this exclusion by the parties.

The *Darner* court accepted the Corbin view (also cited and followed in *Melson*) that even though the writing may appear to be a complete statement of the terms of an agreement that does not mean it is a fully integrated document and evidence should always be taken of all the surrounding circumstances to determine the extent of the integration and the interpretation of the agreement. 3 Corbin, *Contracts*, § 582 (1963).

We see no reason why the appellants here, even though they wrote the contract, should not be permitted to introduce their evidence to show the circumstances surrounding the issuance of the Labs policy. They no doubt have a greater burden since it is "their" policy. *See Almadova v. State Farm Mutual Automobile Insurance Company*, 133 Ariz. 81, 649 P.2d 284 (1982); *Sparks, supra; Berry v. Acacia Mutual Life Association*, 49 Ariz. 413, 67 P.2d 478 (1937). However, this should not foreclose them of the opportunity to present their evidence. If appellants are right and the insureds understood that they would be afforded no coverage for the hair implant process, then the insureds must have been greatly surprised to receive a policy which did not exclude hair implants but instead excluded transplants which they did not do. See the discussion of *Rodemich v. State Farm Mutual Auto Insurance Co.*, 130 Ariz. 538, 637 P.2d 748 (App.1981), appearing in *Darner, supra*, 140 Ariz. at 388, 682 P.2d at 393.

The trial court must receive evidence on surrounding circumstances, including negotiation, prior understandings, subsequent conduct and the like to determine the parties' intent with regard to the integration of the agreement. Once the court is able to decide what constitutes the agreement, the evidence may be used to interpret the meaning of the exclusion in the agreement. The interpretation of a negotiated agreement is not limited to the words set forth in the document. *Darner, supra.*

The appellants' final issue concerns an award of $65,000 to Labs, Men, Phoenix, Behar and Singer for their attorneys fees and costs in the defense of the personal injury actions. The appellants do not contest the amount of this award nor do they question the fact that such expenses were incurred. Nor do they contend that they could not be held liable for

such attorney fees and expenses if they breached their obligation to defend. *See State Farm Mutual Automobile Insurance Company v. Paynter,* 122 Ariz. 198, 593 P.2d 948 (App.1979); *Granite State Insurance Corporation v. Mountain States Telephone and Telegraph Company,* 117 Ariz. 432, 573 P.2d 506 (App.1977); *Gray v. Zurich Insurance Company,* 65 Cal.2d 263, 54 Cal.Rptr. 104, 419 P.2d 168 (1966). Their complaint is that the claim for these damages was dismissed at trial.

In order to put this issue in proper perspective, it is necessary to explain certain other facts and to review the pertinent pleadings and record. Sometime after the complaints were filed by the now judgment creditors, counsel for Labs, Men, Behar and Singer notified the appellants and called upon them to defend. The appellants denied coverage and refused to undertake the defense. The plaintiffs and defendants in those sixteen-odd lawsuits then entered into "Damron Agreements" [3] whereby the plaintiffs agreed not to execute against the insureds (Labs, et al.) in return for an assignment of the insureds' rights against the appellants. In pertinent part the agreement provided that if it was established that the insurers had wrongfully refused to defend, the fees and costs of defense owing to the insureds counsel would be collected by the plaintiffs and thereupon paid to said counsel. The insureds (Labs, et al.), when served with the complaint for declaratory judgment, filed an answer and counterclaim alleging breach of the insurance contracts and bad faith on the part of the appellants. They sought compensatory damages because of the attorneys fees and expenses and prayed for punitive damages to punish the appellants for their bad faith conduct. Appellees Wagner, Gregory and Stonebreaker also filed a counterclaim alleging breach of contract and bad faith and seeking both compensatory and punitive damages. The record contains no pretrial order although the parties each submitted pretrial statements. The pretrial statement of the ap-

pellants does not list as an issue the claim for these attorneys fees and expenses, although pretrial statements of the defendants do list the issue.

During the trial the following record was made concerning this issue.

THE COURT: Mr. D'Antonio [counsel for Labs, et al.], you're not gonna present evidence on bad faith; are you?

MR. D'ANTONIO: Your Honor, I— this is the only thing I'm gonna present my evidence on, basically is that we purchased insurance and what damages we've suffered as a result of the insurance company not—not providing us with a defense, which would really be just attorneys' fees and costs.

MR. MITCHELL: Well, that is a bad faith claim, Your Honor.

THE COURT: I don't think you have a claim on that. I think you have a claim for attorneys' fees on the basis of declaratory judgment action, but I don't think you have any on any other basis.

MR. MITCHELL: At this time, I agree.

THE COURT: No, I don't think you do.

MR. D'ANTONIO: Well, Your Honor—

THE COURT: Part of the problem I have is that Mr. Haralson, on behalf of his clients [judgment creditors], Mr. Ricker now has the same bad faith claim, and he isn't gonna give that up; are you?

MR. RICKER: No, Your Honor.

MR. MITCHELL: You can't split a cause of action, Your Honor.

MR. D'ANTONIO: Well, Your Honor, let me say it this way: I may be incorrect, and we may not have the claim, but I think, certainly, we should be able to put on our evidence, and if you decide we do have the claim, then we would be entitled to recover.

THE COURT: I'll just decide right now you don't.

MR. D'ANTONIO: Pardon me?

---

**3.** *See Damron v. Sledge,* 105 Ariz. 151, 460 P.2d 997 (1969).

THE COURT: I'll just decide right now you don't.

MR. D'ANTONIO: Well, Your Honor, I'd like to be heard on it then.

THE COURT: Go ahead.

MR. D'ANTONIO: We filed a counterclaim against this insurance company and we alleged that we suffered damages as a result of their bad faith refusal to defend us, and as a result of that, we've incurred attorneys' fees and court costs which are astronomical, as I'm sure the court is aware, and in order to protect ourselves, we entered into a Damron type agreement, we assigned in that agreement all of our rights against the insurance company, we later took an assignment back from the individual plaintiffs—or their counsel, acting on their behalfs, with respect to our claim for attorneys' fees. So we think that we still have the claim, at least as to attorneys' fees anyway. As to any other portions of the claim, I don't make any avowal to the court whatsoever that we're attempting to receive more than what we have the right to—to collect. I think Mr. Ricker's clients can certainly recover any bad faith action that exists as a result of what the insurance company did, and that would go towards punitive damages or general damages that my clients have suffered. And I agree that those were assigned.

I also think that, uh, even if you feel that I don't have the bad faith claim, then, of course, Mr. Ricker has the bad faith claim in its entirety, and he would be permitted, of course, to recover those sums of money.

So that's my position, and, uh, if you feel that I don't have the claim, of course, have to proceed on without the bad faith, and we'll just go to our—just to the counterclaim and the damages.

THE COURT: Whether you have it or Mr. Ricker has it.

MR. D'ANTONIO: To the entire claim?

*      *      *      *      *      *

THE COURT: I don't think you can split it up and say: Well, we are gonna give part to Mr. Ricker and we wanna retain part of it.

MR. D'ANTONIO: Well, Your Honor—

THE COURT: And particularly the way Exhibit Ten is worded, I don't know what your reassignment thing looks like, but—

MR. D'ANTONIO: Well, Your Honor, maybe the thing to do—

THE COURT: —from the status of the evidence I have, I don't think you have a claim for any recovery, attorneys' fees or whatever, on bad faith.

MR. D'ANTONIO: Well, Your Honor, maybe the thing for me to do is to take a moment, have a recess and discuss the matter with Mr. Ricker, and find out exactly what his position is as to whether or not he wants to proceed with his portion of that claim or not. Then, maybe we can handle it that way.

MR. MITCHELL: May I respond, briefly, for the record, Your Honor, please?

THE COURT: M'hum.

MR. MITCHELL: I just wish to ask that the court take judicial notice that the declaratory judgment action and the answer and counterclaim filed by and on behalf of the insureds was done after the claims had been assigned and transferred.

THE COURT: Allegations and admissions regarding all of that—I think there's an admission to all of the answers, that those had been assigned.

MR. MITCHELL: They had nothing, and I heard an avowal in this courtroom that there was, in fact, a reassignment, and I'm waiting to see it.

THE COURT: Well, I'll let them see what they want to do with it, but I have some real difficulty in splitin' the claim on the bad faith.

So let me know what you wanna do, and then when you decide what you wanna do, I'll have to rule something I guess.

MR. RICKER: Thank you.

(A recess was held at 2:52 o'clock p.m., and the following ensued in open court at 3:31 o'clock p.m.)

THE COURT: All right, Mr. D'Antonio?

MR. D'ANTONIO: Judge, what we've decided we're gonna do is let Mr. Ricker present the counterclaim and the only thing that he'll be presenting will be the breach of contract portion of the counterclaim which will really only go to the damages that flow from that which will be attorneys' fees and court costs, and I won't present anything on my counterclaim.

MR. RICKER: Your Honor, I would agree that any proceeding as to bad faith would not take place.

THE COURT: All right.

On the basis of those statements then, let the record reflect that the counterclaim—Mr. D'Antonio's dismissed the counterclaim of Mr. Ricker on behalf of the defendants Wagner, Gregory, and Stonebreaker.

Count two is dismissed; is that right, that count?

MR. RICKER: As it relates to bad faith and not breach of contract.

THE COURT: Yes, yes.

Okay, you don't have any problem with that; do you?

MR. MITCHELL: No, sir.

THE COURT: Okay.

Although this record is confusing, the bottom line appears to be that the bad faith claims contained in the counterclaims were dismissed but not the claim for breach of contract. It is the latter claim which gives rise to the damages incurred by Labs, et al., for attorneys fees and expenses.

We note that the minute entry for that day states:

On the basis of the statements set forth on the record,

IT IS ORDERED that the counterclaim on behalf of Mr. D'Antonio's clients be dismissed and the counterclaim of Mr. Ricker on behalf of the defendants, Wagner, Gregory and Stonebreaker, Count 2, is dismissed as it relates to bad faith and breach of contract.

On the basis of the transcript record which we have quoted in its entirety, this recital in the minute entry is incorrect. Support for this conclusion is found in portions of the transcript following where evidence is presented, without objection, pertaining to these damages. In the direct examination of Mr. Singer by Mr. D'Antonio we find the following:

Q. Now, sir, you're aware that your attorney tendered the defense of the various lawsuits that were filed against you to your insurance carrier; is that correct?

A. Yes, sir.

Q. And you're aware that your insurance carrier did not accept the tender; is that correct?

A. Uh, yes, sir.

Q. Would you tell the court whether or not you have incurred any attorney's fees and court costs as a result of their refusal to defend ya.

A. Absolutely.

And in the cross examination of the witness by Mr. Ricker:

Q. Mr. Singer, by virtue of your insurance carrier's refusal to undertake the defense of the case, has Esquire Labs of Arizona, Inc., Esquire for Men of Phoenix, Inc., Esquire for Men, Inc., Sol and Elaine Behar, and Daniel and Paula Singer sustained attorney's fees?

A. Unquestionably.

Q. Mr. Singer, were those attorney's fees all related to the defense of this action?

\* \* \* \* \* \*

THE COURT: Were all of those attorney's fees related to this action.

THE WITNESS: As far as I'm concerned, they're all tied in together.

BY MR. RICKER:

Q. Were some of those re—attorney's fees related to the actions filed by the injured people against you in what we've called the underlying action?

A.   Yes.

Q.   So you sustained—all of those entities sustained attorney's fees from the underlying action as well as this current case, what we've called the declaratory judgment—

A.   Absolutely.

Q.   —action.

If the breach of contract claim had been dismissed then this evidence would have been irrelevant and immaterial. The fact that it came in without such objection further convinces us that this issue was still in the case.

After the conclusion of the trial, extensive memoranda were filed. The court then by minute entry found against the appellants and directed that proposed findings and conclusions be submitted. The findings and conclusions submitted jointly by the defendants, which were finally adopted by the trial court, contained conclusions of law that the appellants had a duty to defend, that duty was breached and they were liable to the insureds for all sums expended in defending the underlying actions, including court costs and attorneys fees. The appellants objected to the proposed conclusions saying: "... counsel is of the understanding that the court has directed a verdict against the insureds on this claim by virtue of their assignment of the insurance policies to the judgment creditors." This is a different objection than they now make on appeal. Nevertheless this gave the trial court an opportunity to consider all objections since in their memorandum in support of their objections they do contend that the claim was dismissed. The trial court obviously believed that the claim had not been dismissed since the final judgment contained the award. As we have stated we believe the trial court could properly arrive at that conclusion.

The parties have all requested the court to allow attorneys fees on appeal pursuant to Rule 21(c) of the Rules of Civil Appellate Procedure, 17A A.R.S. All parties are directed to file a statement of the amount claimed for such fees with their statement of costs pursuant to Rule 21(a). The parties are all directed to file memoranda in support of their claim for attorneys fees and/or in opposition to the claims of the other parties or party for attorneys fees. The court may or may not award attorneys fees to certain of the parties.

Affirmed in part, reversed and modified in part and remanded.

HATHAWAY, J., and ROBERT B. BUCHANAN, Superior Court Judge, concur.

NOTE: Hon. Lawrence Howard having recused himself in this matter, Hon. Robert B. Buchanan was called to sit in his stead and participate in the determination of this decision.